CASE 39—PETITION EQUITY—JUNE 5.

## Sally Grider vs. Rodes, &c.

### APPEAL FROM WARREN CIRCUIT COURT.

1. UNDRAWN SALARY OF A DECEASED CONGRESSMAN.—Hon. Henry Grider died September 7th, 1866, after taking his seat as a member of the Thirty-ninth United States Congress, leaving undrawn, of his compensation as such member, three thousand one hundred and twenty-seven dollars and six cents, which amount, under a resolution of Congress, was drawn by his widow, and claimed by her in her own right. At the suit of the heirs of said decedent, the circuit court, deciding that said fund belonged to said Grider's estate, and not to his widow, rendered judgment against her accordingly. On the appeal of the widow that judgment is affirmed by an equal division of the Court of Appeals.

2. COMPROMISE BY AN ADMINISTRATOR.—By an antenuptial marriage contract the widow was entitled to receive from her husband's estate

Sally Grider vs. Rodes, &c.

property to enable her to resume housekeeping, farming, &c. Instead of delivering to her property in kind, the administrator agreed to sell the property, and to pay her a stipulated sum. There being no imputation of fraud, that agreement is sanctioned and enforced.

J. R. UNDERWOOD,                   For Appellant,

CITED—

14 *U. S. Statutes at Large, p.* 577 ; 1 *Ib.,* 70 ; 3 *Ib.,* 345.

1 *Jacobs' Law Dictionary, " Chose," p.* 452.

7 *Mon.,* 439 ; *Divine vs. Harvie.*

*Joint Resolution of Congress of March* 3, 1859.

*Civil Code, secs.* 153, 154.

3 *Hawks,* 25 ; *Pigot vs. Davis.*

1 *Rice,* 400 ; *The State vs. McBride.*

4 *Blackf.,* 146 ; *The State vs. Adams.*

*Constitution U. S., sec.* 1, *art.* 2, *and sec.* 5, *par.* 3, *art.* 1.

*Resolution of Congress, Journals* 2d *sess.* 39th *Congress, p.* 135.

*Mes. and Reps.,* 2d *sess.* 39th *Congress, No.* 21, *p.* 88.

STEVENSON & MYERS and
LOVING & RODES,                 For Appellees,

CITED—

2 *Story's Equity, sec.* 986 *and note, pp.* 1106, 1109, 1099, 1100.

*Tyler on Coverture and Infancy, p.* 460.

1 *Esp. Nisi Prius, s. p.* 271.

2 *Bush,* 54 ; 4 *Metcalfe,* 267.

1 *Blackstone, s. pp.* 21, 104.

*Civil Code, sec.* 855.

*Revised Statutes,* 1 *Stanton,* 282.

1 *Jarman on Wills, s. pp.* 658, 663, *and note.*

Sally Grider vs. Rodes, &c.

2 *Jones' N. C. Rep.*, 75; 5 *B. Mon.*, 141.

2 *Roper, s. pp.* 1110, 1112, 1073.

1 *Bright on Husband and Wife, p.* 316, *sub-sec.* 29.

2 *Ib., p.* 178, *sub-sec.* 17, *and pp.* 171, 175, *sub-sec.* 14.

11 *U. S. Statutes at Large, pp.* 48, 442, 443; 14 *Ib., pp.* 322, 323; 9 *Ib., p.* 367.

17 *sec. Act of Congress of July* 28, 1866.

15 *Johnson's Rep.*, 358; *The People vs. Utica Insurance Company.*

4 *Littell*, 377; *Mason vs. Rogers.*

10 *B. Mon.*, 172; *Phillips vs. Pope's heirs.*

14 *B. Mon.*, 266.

JUDGE PETERS DELIVERED THE FOLLOWING OPINION, IN WHICH CHIEF JUSTICE WILLIAMS CONCURRED, AND FROM A PART OF WHICH JUDGES ROBERTSON AND HARDIN DISSENTED, AS WILL BE SEEN BY THE OPINION OF JUDGE ROBERTSON, *post*, IN WHICH JUDGE HARDIN CONCURRED:

On the 25th of May, 1857, Henry Grider and Sally Bryant, contemplating an intermarriage, which they afterwards consummated, made a marriage contract, whereby it was agreed that said Grider was "to have, control, use, and enjoy, during his lifetime, whatever of estate, real, personal, or mixed, that the said Bryant may own and have title or claim to; and her servants are not to be sold without her free good will and consent, and are to be kept together, to be treated kindly and properly cared for. The said Bryant reserves the right, and the same is hereby given and vested in her, to dispose of, by last will and testament, as she may think proper, any estate that she may own at our marriage, not consumed or otherwise disposed of. The said Grider, by the marriage aforesaid, assumes, and is hereby charged with, the protection and support of the aforesaid Mrs. Sally Bryant and her family, during their joint

lives; and it is understood and agreed that the children, family, and friends of both the contracting parties, shall always have and receive a cordial welcome at the future residence and home of the parties hereto.

"It is distinctly understood and agreed that Miss Susan Haner is to continue to live and reside with the aforesaid Mrs. Bryant, as long as it may be agreeable to them both.

"It is further agreed and made part of this contract, that if the said Grider should die before the said Bryant, that in one year thereafter the said Mrs. Bryant is to be reinvested fully with the possession, control, use, and profits of her real estate and slaves, and so much of the stock then on the farm, and farming utensils, her furniture, &c., &c., as will enable her to resume housekeeping at her own charge and expense.

"As it is the distinct understanding and agreement of the parties hereto that the said Mrs. Bryant waives all claim to dower in any estate the said Grider may have or own at his death—the said Bryant feeling that she has, of herself, and in her own right, an estate ample and sufficient for her comfortable support and maintenance, in the event her aforesaid contemplated marriage is consummated, and she should survive her aforesaid anticipated husband, the aforesaid Grider—she hereby, of her own accord, and voluntarily, disclaims all right or claim to dower in and to any estate, of any character or kind, that the said Grider may have and own at our marriage, or at his death; and consents and agrees that the property and estate of said Grider, at his death, shall pass and descend to his children, or those legally entitled, other than herself. Any and all rights of either of the parties hereto, that may not be embraced or limited in this contract, to be controlled and regulated by law."

Sally Grider vs. Rodes, &c.

In June, 1859, Henry Grider published his will, and died on the 7th of September, 1866, a member of the *House of Representatives of the Thirty-ninth Congress of the United States*, leaving of his compensation for his services as such member three thousand, one hundred and twenty-seven dollars and six cents undrawn, which his widow, a party to the marriage contract herein recited, afterwards drew, and now claims as her own money. The devisees resist her claim; and, in order to settle this, and the asserted claim of the widow to stock and other personal estate, or the price thereof, under the *antenuptial contract*, and to have the direction of the chancellor in the administration and settlement of the estate, the administrator *cum testamento* brought this action.

The court below decided adverse to Mrs. Grider's claim to the money to which her husband was entitled as compensation for his services as a member of the Thirty-ninth Congress, and which he had not drawn; and furthermore decided, that, in addition to the household and kitchen furniture, and a horse and buggy, which she admits she had received, that she was entitled only to one thousand, seven hundred and forty-two dollars and fifty cents of the three thousand six hundred and ninety-eight dollars and thirty cents, for which the personal estate sold at the sale made by the administrator, with the consent of the widow, she agreeing to take in money the value of the stock, &c., that she was entitled to receive under the marriage contract and will of her husband. And being dissatisfied with the judgment of the court below on both of her claims, she asks a reversal of it by this court.

Mrs. Grider's claim to the three thousand one hundred and twenty-seven dollars and six cents due her husband at his death for services rendered as a member of Con-

gress, is based exclusively upon a congressional resolution, approved 3d March, 1859, entitled—

"A joint resolution, amendatory of an act, entitled 'An act to regulate the compensation of members of Congress,' approved the 16th of August, 1856, so far as relates to such members as shall die during their term of service," and is in the following words: "That whenever hereafter any person, elected a member of the Senate or House of Representatives, shall die after the commencement of the Congress to which he shall have been elected, compensation shall be computed and paid to his widow, or, if no widow survive him, to his heirs-at-law, for the period that shall have elapsed from the commencement of such Congress, as aforesaid, to the time of his death, at the rate of three thousand dollars per annum: *Provided, however*, That compensation shall be computed and paid in all cases for a period of not less than three months: *And provided further*, That in no case shall constructive mileage be computed or paid.

"Sec. 2. *Be it further resolved*, That the compensation of each person elected or appointed afterwards to supply the vacancy so occasioned, shall hereafter be computed and paid from the time the compensation of his predecessor is hereby directed to be computed and paid for, and not otherwise.

"Sec. 3. *Be it further resolved*, That the provisions of this joint resolution, so far as the same are beneficial to the widow and heirs-at-law of members of Congress as aforesaid, shall be extended and applied to the widows and heirs-at-law of members elected to the present Congress, who have died since its commencement."

Appellant's claim to this money, therefore, depends upon the meaning and objects of this amendment, about which there is an apparent difficulty; but that can, and

will, be obviated by a reference to the original statute of 1856, whereby its defects and omissions may be discovered, and the remedy intended by the amendment ascertained.

That act, approved the 16th of August, 1856, entitled "An act to regulate the compensation of, members of Congress," or so much of it as is material to this controversy, reads as follows:

"SEC. 2. The compensation of each Senator, Representative, and Delegate in Congress, shall be six thousand dollars for each Congress, and mileage, as now provided by law, for two sessions only, to be paid in manner following, to-wit: on the first day of each regular session, each Senator, Representative, and Delegate shall receive his mileage for one session, and on the first of each month thereafter, during such session, compensation at the rate of three thousand dollars per annum during the continuance of such session; and at the end of such session he shall receive the residue of his salary due to him at such time, at the rate aforesaid, still unpaid; and at the beginning of the second regular session of the Congress each Senator, Representative, and Delegate shall receive his mileage for such second session, and monthly, during such session, compensation at the rate of three thousand dollars per annum, till the 4th day of March terminating the Congress, and on that day each Senator, Representative, and Delegate shall be entitled to receive any balance of the six thousand dollars not theretofore paid in the said monthly installments, as above directed.

"SEC. 4. In the event of the death of any Senator, Representative, or Delegate prior to the commencement of the first session of the Congress, he shall be neither entitled to mileage or compensation; and in the event

of death after the commencement of any session, his representative shall be entitled to receive so much of his compensation, computed at the rate of three thousand dollars *per annum*, as he may not have received; and any mileage that may have actually accrued, and be due and unpaid." (11 *Stat. at Lage,* 48.)

The other sections of the act have no bearing on the question. But it cannot escape attention that this act makes a very clear and distinct difference in case of the death of a member of Congress before the commencement of the *session* of Congress, and of the death of a member afterwards. In the one case no compensation whatever was allowed; in the other compensation and mileage both were allowed to the *legal representatives* of the deceased Congressman.

The 4th of March of each alternate year is fixed by the *Constitution of the United States* for the commencement of *Congress;* but the first Monday in the following December was, at the date of the original act, and the amendment under consideration, the day fixed by law for the commencement of the regular *session* of Congress—a space of nine months from the commencement of Congress to the beginning of its first regular session. The statute *approved* 16*th August,* 1856, increased the compensation of members of Congress to six thousand dollars and mileage, and prescribed how and when they were to be paid; but by the fourth section it was expressly provided, that in the event of the death of a member before the first *session* of Congress, he should not be entitled to compensation nor mileage; and no provision was made for any payment to his widow or heirs, and the whole compensation was paid to the person elected, or appointed to fill the vacancy, although he may have been elected or appointed nine

months or more after the commencement of the Congress, so that the successor was, under this statute, entitled to compensation for nine months before he was a member, while the member who died (it may be) on the first day of the first session, and had been a member elect for nine months or more, would be entitled to no compensation whatever. That this was the effect of, and the construction given to, this statute, is manifest, or otherwise the *second section* of the amendatory resolution, approved the 3d of March, 1859, would have been wholly unnecessary, and would not have been inserted.

The resolution approved the 23d of December, 1857, authorized each member, on the first day of each *session* of Congress, or as soon thereafter as he *attended* and applied for the same, to receive his mileage and compensation from the commencement of his term, at the rate of two hundred and fifty dollars per month, to the beginning of the session; and compensation at the same rate during the session, and on the first day of the second, or any subsequent session, he was entitled to receive mileage and all compensation which had accrued during the adjournment; and during said session compensation at the same rate. (9 *Statutes at Large*, 367.)

This resolution fixed more definitely the periods at which members were entitled to receive their compensation, and perhaps was passed the better to procure the prompt *attendance* of members; but failed to provide a remedy for the defect or omission in the former statute, to make compensation to the widow, heirs, or personal representative of a member of Congress who happened to die before a *session* of Congress commenced after his election; and this defect or omis-

sion the resolution of the 3d of March, 1859, was intended to, and did in fact, remedy. But as Grider lived until after the commencement of the *first session* of the Thirty-ninth Congress, and was entitled to receive compensation for the whole time—from the commencement of that Congress to his death—and did receive a part of it, the residue of his compensation, which he failed to receive, passed to his personal representative for the payment of debts or legacies. It was his absolute property; and there is nothing in the record conducing remotely even to the conclusion that Grider believed that his widow would be entitled to his compensation which he had not drawn; but that conclusion is repelled by the fact that it is expressly charged by appellees in their cross-petition that he declared that he had not drawn all his compensation, but intended to do it, and to appropriate it to the payment of his debts, and treated it as a fund for that purpose; and that allegation is not denied.

Where a member of Congress died before the commencement of the first regular *session* after he was elected, having received no compensation whatever, a sense of common justice demanded that provision by law should be made to pay to his surviving widow or heirs compensation, in proportion at least, to what he would have been entitled to receive if he had lived until after the commencement of the *regular session*. But under the *statute of* 1856, *supra*, neither she nor they could receive anything whatever; and to provide a remedy for that defect or omission in that statute, the amendatory resolution now under consideration was passed. Prior thereto, if the member survived the commencement of the first regular *session* after he was elected or chosen, he had a right, under the law, as we

have already seen, to receive the whole of his compensation up to that time. It then become a part of his estate, and he might dispose of it by will or otherwise, as he pleased, so that his widow or heirs-at-law, if he thereafter died, would get the benefit of it, without any further legislation on the subject, which is precisely the case now before the court.

Another consideration should be mentioned as fortifying this conclusion. Grider had a perfect right to this money, and could, before his death, have drawn it and appropriated it in any way he chose to do. This right is not questioned by the distinguished counsel for appellant, which, if Grider had done so, would have left his widow without a color of right to it, or to any compensation whatever on account of the death of her husband while he was a member of Congress.

If the construction of the resolution contended for be the true one, then the widow, of a member of Congress, who died after the commencement of the first regular *session*, and had drawn all the compensation he was entitled to up to his death, would be entitled to nothing. While the widow of another member, who may have died on the same day, and who had drawn no part, or a part only of his compensation then due, would be entitled to whatever her husband had not received; and if it did not amount to as much as three months' compensation, the deficit would be made up to her. It cannot be supposed that so wise a body as a Congress of the United States would make its beneficence to the widows of its deceased members depend on such a contingency—leave it to vibrate between the necessities or prodigality of the husband of the one, and the independence and frugality of that of the other, and to rest at last where it was least needed. Without pur-

suing the investigation further, the CHIEF JUSTICE and Judge PETERS conclude that the appellant had no legal right to the money under the resolution of *March*, 1859, *supra*. We cannot see how it can be properly said that Congress has approved the construction of this amendatory resolution of 1859, contended for by appellant. Congress, so far as we have seen, has never acted on the question. The construction of the disbursing officer to that effect, as evidenced by paying the money to Mrs. Grider, certainly does not furnish any evidence that Congress would give to the resolution the same construction.

But it is contended on her behalf, that even if she was not entitled to this money, and it was paid to her without legal authority, such payment was no satisfaction of the demand; but the Government of the United States still owes the debt, and as the money was paid to her by an officer of said government, the State courts have no jurisdiction to compel her to pay it to appellee. The money was not paid, or authorized to be paid, by any act of Congress; but it was paid to her wrongfully, or by mistake; and the fact that it was paid by an officer of the *United States*, cannot deprive the State courts of jurisdiction to correct the error. Appellant has money to which another is entitled, and is responsible for it to the owner by the laws of the State, as for money had and received to his use; and the mistake of the officer or agent of the government cannot confer jurisdiction on the Federal court to correct it.

Whether the subsequent act of Congress, increasing the compensation of members and fixing the commencement of the first *session* on the same day of the commencement of the *Congress*, constructively repealed the resolution of 3*d of March*, 1859, *supra*, need not now be determined.

The CHIEF JUSTICE, who was not present when the first opinion was delivered, and would not have concurred therein, and Judge PETERS, are of opinion that appellant, Mrs. Grider, is not entitled to the Congress money, and must, therefore, account for it, in which conclusion Judges ROBERTSON and HARDIN do not concur; and that part of the judgment of the court below is *affirmed* by an equal division of the court.

The only remaining question is, whether appellant was entitled to more, under the marriage contract, to enable her to resume housekeeping, than was adjudged to her by the court below. By the terms of that contract, she was to have all her furniture, and so much of the stock on the farm, farming utensils, &c., as would enable her to resume housekeeping at her own charge. The several kinds of stock she was to have were such as were on the farm; but she was not restricted to any particular number of each or any of it, nor was there any estimate of the value of what she was to have; and so of the farming utensils. If, therefore, it required all of each species of property on the farm to enable her to resume housekeeping in a manner suitable to her age and manner of living, and her position in society, she was entitled to it. What she was to have, or might be entitled to, was properly left by the contract to be fixed and determined upon when the event should happen which they were providing for. Her taste and wishes, to some extent, were according to the spirit of the contract, considered in reference to her situation before her marriage, and were not to be disregarded. What amount of this property would be required, under all the circumstances, to fulfill the contract, is a question about which people would naturally, and very honestly, dif-

VOL. V—19

fer, and about which litigation might arise. The administrator must be presumed to have known as well, if not better than any one else, what was just and proper to be done, and having adjusted the matter with appellant, without the imputation of fraud or dereliction of duty to the estate he represents, no sufficient reason is shown for disturbing the settlement made by him of the amount appellant should have ; wherefore, as to so much of the judgment of the court below as set aside the agreement made by appellant with the administrator, the same, by the unanimous opinion of the court, is *reversed*, and the cause remanded, with directions to render judgment against appellant for three thousand one hundred and twenty-seven dollars and six cents, which is called the " Congress money," to be credited by two thousand six hundred and ninety-eight dollars and thirty cents, the amount arising from the sale of the personalty, less one thousand dollars, which she agreed the administrator should retain ; and she must pay interest on the balance at the rate of six per cent. per annum from the 14th of December, 1866, till paid, that being the day on which the action was commenced, and must pay costs in the court below, incurred by the litigation of these questions, and will recover costs in this court.

———

JUDGE ROBERTSON DELIVERED THE FOLLOWING OPINION, IN WHICH JUDGE HARDIN CONCURRED:

On the 25th day of May, 1857, Henry Grider, a widower, with several children, and who died September 8th, 1866, a member of the Thirty-ninth Congress, and Mrs. Sally Bryant, contemplating their intermarriage, which was shortly afterwards consummated, made a nuptial

contract, whereby, among other stipulations not material in this case, they agreed—1st. "That the said Grider is to have control, use, and enjoy, during his lifetime, whatever of estate, real, personal, or mixed, that the said Bryant may own, or have title or claim to; and her servants are not to be sold without her free good will and consent, and are to be kept together, to be treated kindly, and properly cared for. The said Bryant reserves the right, and the same is hereby given and vested in her, to dispose of, by last will and testament, as she may think proper, any estate that she may own at our marriage, not consumed or otherwise disposed of." 2d. "That if the said Grider should die before the said Bryant, the said Mrs. Bryant is to be reinvested fully with the possession, use, control, and profit of her real estate, slaves, and *so much* of the stock *then* on the farm, and farming utensils, her furniture, &c., as will enable her to resume housekeeping at her own charge and expense; as it is the distinct understanding and agreement of the parties hereto that the said Mrs. Bryant waives all claim to dower in any estate the said Grider may have or own at his death," * * "and agrees that the property and estate of the said Grider, at his death, shall pass and descend to his children."

Grider, at his death, had failed to draw of his compensation, as a member of the House of Representatives of the United States, three thousand one hundred and twenty-seven dollars and six cents, which his surviving widow afterwards drew, and claims as her own property under the authority of a Congressional resolution in 1859, in the following words: "That whenever, hereafter, any person elected a member of the Senate or House of Representatives shall die after the commencement of the Congress to which he shall have been so elected,

compensation shall be computed and paid to his widow, or, if no widow survive him, to his heirs-at-law, for the period that shall have elapsed from the commencement of such Congress, as aforesaid, to the time of his death, at the rate of three thousand dollars per annum: *Provided, however,* That the compensation be estimated in all cases for a period of not less than three months."

" "Sec. 2. *Be it further resolved,* That the compensation of each person elected or appointed afterwards to supply the vacancy so occasioned, shall hereafter be computed and paid from the time the compensation of his predecessor is hereby directed to be computed and paid for, and not otherwise.

"Sec. 3. That the provisions of this joint resolution, so far as the same are *beneficial* to the *widow* and heirs-at-law of members of Congress, as aforesaid, shall be extended and applied to the widows and heirs-at-law of members elected to the present Congress, who have died since its commencement."

The act of 1856, changing the compensation of members of Congress from a *per diem* to six thousand dollars a term, provides, that " on the first day of each regular session, each Senator, Representative, or a Delegate, shall receive his mileage for one session; and on the first day of each month thereafter, during such session, compensation at the rate of three thousand dollars per annum during the continuance of such session;" and the fourth section of the act is in these words: " In the event of the death of any Senator, Representative, or Delegate, prior to the commencement of the first session of the Congress, he shall neither be entitled to mileage, or compensation; and, in the event of death after the commencement of any session, his representative shall be entitled to receive so much of his compensation, computed at the rate of

three thousand dollars per annum, as he may not have received, and any mileage that may have actually accrued, and be due and unpaid."

While Grider was in Congress, the compensation was increased to five thousand dollars a year, without any change in the mode of payment; and an act of 1867 required a meeting of the Fortieth, and of every succeeding Congress, on the 4th of March, thus making the commencement of the term and of the first session of it simultaneous. But as Grider died before this last enactment, it can have no other than an illustrative application to this case. It cannot, in any way, retroact on Mrs. Grider's claim, which had accrued in 1866; nor could it operate thereafter as a constructive repeal of the law of 1859, under the authority of which she had drawn pay; and her husband's election and services having been under the law of 1859, he served on the contingencies and conditions prescribed by that law, and, by necessary implication, accepted them. His wife's title, therefore, cannot be invalidated by its imputed unconstitutionality.

The legislative purpose of the act of 1856 (substituting an annual salary for a *per diem* compensation), in withholding any payment until the commencement of a session, was evidently to stimulate members to a punctual attendance and faithful service. And an act of 1857, requiring attendance before pay, indicates more clearly the same object. But the aim of each enactment was not so much to deny compensation without attendance as to suspend payment of it.

And this is confirmed by the provision, that if a member die, as Grider did, after the commencement of his first session, his representative shall have a right, at once, to draw his unpaid mileage and his compensation from the commencement of his term to the time of his

death. As the act of 1856 made no provision for the case of death before the first session, the deceased member's representative could not be entitled to draw either mileage or compensation; and, therefore, the government would gain that much, or his successor would gratuitously get it; but to give this, and only this, to the widow, cannot be reasonably presumed to be the sole object of the resolution of 1859; because it expressly applies to death after, as well as before, the beginning of the session; and because, also, it allows for three months' pay even if her husband had died only a day after the commencement of his term, when his representative could have drawn comparatively nothing. It provides, *without restriction or qualification*, that *whenever* a member shall die after the commencement of his term (that is, before or after the commencement of the first session), his "widow or heirs" *shall* be entitled to draw his salary from the commencement of his term *to his death*. The widow is thus substituted for both the successor and personal representative—the successor, if her husband died before the commencement of the first session, and the administrator or executor, if the death occured afterwards. It is thus immaterial to the widow's title whether her husband died during a session or in vacation—before he took his seat or afterwards; for if he died before he took his seat, her right to his proportionate compensation is unquestioned and unquestionable; and if he had ever occupied his seat and not drawn his pay, which his administrator might have drawn, the act of 1859 indisputably includes, without a chasm, all the time from the commencement of his term to his death, and clearly substitutes the wife for the administrator; and the same policy which gives his widow full compensation until his death before taking his seat,

would give it to her down to his death after taking his seat. If this be not intended, then the act should have said so, instead of undoubtedly declaring the contrary; and such express and explicit provision cannot be safely overruled or essentially qualified by *guessing* a different motive directly contradicting the unambiguous language of the law, which itself affords no clue for such assumed motive, inconsistent with the inevitable construction of the language. Acting on such imaginary motive in such a case would be more like a legislative than a judicial act. We prefer to take the act as it is, without conjectural interpretation. Besides, the resolution provides that the pay of the successor shall be computed from the time when that to the widow ceased. Then, if hers does not exclude any portion of a session, the successor would be entitled to pay for his predecessor's services, contrary to the express provision passing it to the representative of the deceased member. This also fortifies the literal construction.

The annual salary is not apportioned by the value or duration of actual service, but by the lapse of time only; and the ratable compensation to which a member had title at his death is proportionate to the time which elapsed between the commencement of his term and his death, unaffected by actual service or non-service during the interval. This seems to be self-evident, and is illustrated by the act changing the commencement of the session, and increasing the compensation to five thousand dollars a year. That act constructively repeals the acts of 1856–7, not only as to the rate of compensation, but also as to the time of payment; and now the member's title to pay commences on the first day of his term; and though his subsequent non-attendance may suspend further payment,

yet it would not affect his right to continued compensation as long as he shall remain a member. No other consistent interpretation can be given to the act, and how can this act constructively repeal the resolution of 1859 as to the widow's right? Certainly not by increasing the pay, and as certainly not by changing the commencement of the session; for her right does not depend on the actual session. But, as before suggested, the repeal, if admitted, could not affect Mrs. Grider. Then, what is there in any of those enactments which can consistently control the literal provision of the act of 1859, which declares, that if a member die after the commencement of his term, his widow shall be entitled to his compensation from the commencement "*to his death?*"

The whole undrawn salary to which Grider had title at his death, even though he may not have had a right to draw it so soon, would have gone to his personal representative, had not the act of 1859 substituted his widow or distributees. Then why, under that act, is *she* not entitled to *the same* extent? That she is, seems to be the only logical conclusion. The reason of her admitted right to one quarter's salary, at least, under all circumstances, applies inevitably to all the salary, which, without the act of 1869, her husband's administrator would have been entitled to draw. And not only does the letter of the law so provide by the only consistent construction according to the context, spirit, and object, but the practical construction by Congress itself, whose agent, acting under its authority, so pays the widow, and would pay no one else, is strongly corroborative.

And could the member himself object to this posthumous dedication of it to those he cared most for,

instead of being either lost or given to creditors? We may presume that the object of that provident diversion was to secure a *peculium* to his desolate family—often necessary to them, and always a sacred memorial of himself. And as in this case Grider died without drawing or making any other disposition of his pay to his death, whatever may be said or argued to the contrary, he seems to have intended that his surviving wife should draw and use it as her own, as some requital for his enjoyment of cohabitancy in her house, and of the profits of her land and personalty and numerous slaves. Why else, when he came home to die, did he not bring his undrawn salary with him? But however this may be, the inflexible benevolence of the law gave his widow the right to draw for her own use what he chose not to appropriate to his own use. Before his death his property in it was only potential. It never became consummate; but the instant he died, became hers. Consequently, the marriage contract respecting his property left at his death did not embrace that fund, *which was then hers, and not his.*

The foregoing is substantially the first opinion rendered by this court, and it is yet the opinion of Judges ROBERTSON and HARDIN. But the CHIEF JUSTICE and Judge PETERS having come to a different conclusion, an equal division of the court results in an affirmance of the judgment below, requiring Mrs. Grider to pay back to Grider's estate the money which Congress had paid to her as his widow.

NOTE.—See next page for response to petition for rehearing.

To APPELLANT'S PETITION FOR A REHEARING JUDGE PETERS DELIVERED.
THE FOLLOWING RESPONSE:

After a very elaborate argument by the distinguished
gentlemen representing the parties to this litigation on
the first trial in this court, the judgment of the circuit
court was reversed; the CHIEF JUSTICE being absent.
Upon the petition filed by appellees a rehearing was
granted; and when the case came on a second time
for hearing, it was again elaborately argued by two of
the gentlemen (one on each side) who had argued it on
the first trial. The judgment of the circuit judge dis-
posing of the fund called "*the Congress money*" was
*affirmed* by an equally divided court; and the counsel
for appellant now asks a rehearing. In his petition,
after quoting from the opinion of the two judges who
concurred with the circuit court, he says: "Now, it
seems to me almost *impossible* that the judges who con-
curred in the opinion delivered, could have sanctioned
the statements and positions I have quoted, had they
known the fact I am now about to state. The Congress
money was paid to appellant *by virtue of a resolution*
passed by the House of Representatives, of which Col.
Grider was a member at the time of his death, in these
words: '*Resolved*, That the Sergeant-at-Arms be, and
he is hereby, directed to pay to Mrs. Sally Grider, widow
of Henry Grider, deceased, late a member of this House,
the amount of compensation, including the increased
compensation *unpaid and due to the said Henry Grider,
as a member of this House, at the time of his death, on the
7th of September*, 1866.'"

It is true, the judges who concurred in the opinion
complained of did not know the fact disclosed—that the
resolution quoted had passed the House of Representa-

tives of the Congress of the *United States*. The learned counsel who had twice argued the case, and had replied to the petition of opposing counsel for a rehearing, had never disclosed the fact to the court, and the judges would not, and did not think of looking in *the Journal of the House* to find a resolution repealing or modifying a law and resolutions previously passed by the *Congress of the United States;* nor did the gentleman who introduced the resolution above referred to, and who once argued the case orally before the court, say certainly that such a resolution had passed the *House*. It is found on *page* 135, *House Journal, second session Thirty-ninth Congress*, 1866–'67.

In all the arguments submitted to this court by the counsel for appellant, who now presents this petition, this money was claimed as belonging to Mrs. Grider under the *act of Congress of the 3d of March*, 1859, recited in the opinion of Judges WILLIAMS and PETERS; and in his brief, filed 21st December, 1868, he says: "I insist that the administrator and children of H. Grider, deceased, never were entitled to one cent of this money. If it belonged to H. Grider before he died, he would have drawn it, or transferred it, or disposed of it by his will. He did neither; but left it in the treasury, *and it was paid under said act*" (referring to the act *of the 3d of March,* 1859) "*to his widow for* her benefit, according to law." The concurring judges then had the statement of the learned counsel that the money was paid under the *act* aforesaid, and not under the resolution brought to light, for the first time, in his petition for a rehearing. And they might be excused for relying upon that statement of counsel, without examining for any other action of *Congress* on the subject. And they would not have examined in the journals of the House of Representatives

to see if a law had been passed to change a law passed by *both Houses of Congress,* and approved by the *President* of the *United States.*

The resolution could have no such effect; and unless Mrs. Grider was entitled to the money under the *act of Congress* referred to in counsel's brief, she was not entitled to it at all; and we think she was not entitled to it by any law whatever.

But the resolution, so recently brought to the knowledge of the court, shows conclusively that the House of Representatives, or at least every member who voted for it, regarded the money as belonging to Henry Grider at his death, forming a part of his estate, and believed it was to pass to his representatives.

It is said, in so many words, that the compensation unpaid was *due to him* at his death. If it had been Mrs. Grider's, we may assume that the resolution would never have been introduced, as it would, in that event, have been useless and unnecessary.

The CHIEF JUSTICE and Judge PETERS consider the conclusion to which they came, as expressed in the opinion delivered by the latter, as fortified and strengthened by what has subsequently occurred, and oppose the granting of a rehearing; consequently, the petitition is overruled by an equally divided court, Judges ROBERTSON and HARDIN favoring a rehearing.